# United States Court of Appeals
## For the First Circuit

No. 24-1952

PAULA APPLETON, a/k/a PAULA SWEET,

Plaintiff, Appellant,

v.

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, P.A. and
AIG CLAIMS, INC.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Margaret R. Guzman, U.S. District Judge]

Before

Barron, Chief Judge,
Gelpí and Rikelman, Circuit Judges.

Kathy Jo Cook, with whom Timothy Wilton, Abbie G. Rosen, and
Sheff & Cook, LLC were on brief, for appellant.

William A. Schneider, with whom Morrison Mahoney LLP was on
brief, for appellees.

July 29, 2025

**RIKELMAN, <u>Circuit Judge</u>.** In January 2015, Paula Appleton suffered severe injuries after a pickup truck struck her car from behind. Appleton filed an insurance claim against the driver, whose policy was administered by AIG Claims, Inc. ("AIG"). Over the next four years, Appleton and AIG exchanged settlement offers and attended three mediations but were unable to reach a settlement. Following a trial, a Massachusetts state court jury ultimately awarded Appleton $7.5 million in damages in March 2019.

Appleton then sued AIG and a related defendant in federal court. She contended that the defendants failed to meet their statutory obligations under Massachusetts law to conduct an independent, objective investigation into her insurance claim and to extend a prompt and fair settlement offer after the value of her damages became clear.

The federal district court granted the defendants' motion for summary judgment in full. It concluded that the undisputed facts established that the defendants did conduct a reasonable investigation into Appleton's case and that their duty to extend a prompt and fair settlement offer was not triggered because the value of her damages never became clear. Because we determine that a reasonable jury could find that Appleton's damages became clear in early 2018 and that the defendants failed to extend a prompt and fair settlement offer afterwards, we vacate the

district court's summary judgment ruling in part and remand for trial on Appleton's settlement claim.

## I. BACKGROUND

In reviewing the district court's grant of summary judgment to the defendants, we recite the facts in the record in the light most favorable to Appleton and draw all reasonable inferences from those facts in her favor. See <u>Sutherland</u> v. <u>Peterson's Oil Serv., Inc.</u>, 126 F.4th 728, 734 (1st Cir. 2025).

### A. The Accident and Initial Claims

In January 2015, when she was 34 years old, Paula Appleton sustained life-altering injuries in a car accident. Appleton was the passenger in a car that her fiancé (now husband) was driving when a pickup truck struck their car from behind and propelled it underneath the tractor-trailer in front of them, nearly flattening their vehicle. Emergency responders had to extricate Appleton from the car and then transport her to a hospital via helicopter. There, Appleton was diagnosed with severe injuries, including a hemorrhage, pelvic fracture, hip fracture, leg fractures, and a ruptured bladder. She remained in the hospital for nearly three weeks and then spent an additional four months in inpatient rehabilitation facilities. Appleton eventually filed an insurance claim against the driver of the pickup truck and his employer, a company with a liability insurance

policy with National Union Fire Insurance Company ("National Union"), administered by AIG.

AIG received notice of Appleton's claim and, in December 2015, assigned it to Nicole Washor, an insurance adjuster. In March 2016, Appleton's attorney, Katherine Bagdis, emailed Washor to introduce herself and share Appleton's crash-related medical records and bills. Three months later, in June 2016, Washor asked Bagdis to share a formal demand package that "summarize[s] all the medical records, medical treatment, pain and suffering, prior injuries, explanation of prior disabilities, future medicals, lien information, [and] liability arguments and [includes] a demand to settle the case." Washor specified that she needed the complete demand package "[i]n order to proceed with a resolution of [the] case."

Appleton's counsel shared the demand package with Washor in August 2016. The package included a formal demand of $18 million to cover Appleton's $600,000 medical lien, $3.72 million in future medical care costs, and $13 million in past and future pain and suffering. It also included an analysis of Appleton's injuries, various medical reports, a life care plan and economic analysis, and a "day in the life" video depicting Appleton's daily experience living with her injuries.

After receiving Appleton's demand, Washor retained defense counsel for AIG. Next, in December 2016, Washor approved

hiring a medical expert and life care planner to review Appleton's damages claims. Around the same time, defense counsel informed Washor that AIG could not pursue a liability defense on the theory that Appleton's injuries were caused by her car hitting the tractor-trailer in front of her (rather than the insured's pickup truck hitting her car from behind). In February 2017, Appleton filed a complaint in state court against the pickup truck driver, his employer, and related defendants.[1] In March 2017, defense counsel reiterated to Washor: "There is no liability defense to [this] case and this is a damages[-]only defense."

## B. Mediations and Settlement Offers

Over the next two years, from March 2017 to January 2019, Appleton and AIG exchanged settlement offers and expert reports but were unable to settle the case, despite participating in three mediations. Appleton and AIG attended their first mediation in March 2017. In response to Appleton's initial $18 million demand, AIG offered $750,000 and then raised its offer to $2 million during the mediation. Appleton rejected both offers and requested $17 million instead. She then asked to suspend the March 2017 mediation so that she could provide AIG more information about her

---

[1] The parties did not dispute that the pickup truck driver was acting within the scope of his employment at the time of the collision. Because the driver's employer maintained a liability insurance policy administered by AIG, AIG investigated Appleton's insurance claim and defended the driver and his employer in Appleton's state court lawsuit.

injuries and damages.  In particular, AIG had indicated it needed additional evidence of Appleton's alleged bladder injury and urinary incontinence.  After the mediation, AIG's defense counsel suggested to AIG that it should wait for Appleton to share this additional evidence before retaining medical experts of its own.

The parties scheduled their second mediation for October 2017.  A few days in advance, Appleton's counsel shared with AIG reports from two urologists.  According to the reports, Appleton suffered from "severe incontinence" due to injuries she received during the crash, and the urologists predicted that the incontinence would worsen over time.  Despite this additional medical information, however, AIG only increased its settlement offer from $2 million to $2.65 million.  Appleton rejected AIG's offer and demanded $16 million instead.

After the second mediation was unsuccessful, AIG began soliciting estimates of a potential jury award in Appleton's case. AIG received three independent estimates between October 18, 2017, and January 4, 2018.  First, defense counsel estimated a jury verdict of between $6.5 million and $8.5 million.  Second, a group of senior AIG claims professionals reviewed Appleton's claim and valued it at an average of $4.9 million.  After receiving these estimates, Washor increased the reserves to pay Appleton's claim from $4 million to $7.5 million.  Third, AIG hired an external jury consulting firm to conduct a mock trial of Appleton's case

and simulate the results of 500 juries. On January 4, 2018, the consulting firm reported an average total damages award of $7.53 million. Despite receiving these three estimates of a potential jury award ranging from $5 million to $8.5 million by early January 2018, AIG did not increase its prior $2.65 million settlement offer to Appleton for nearly one year (until mid-December 2018).

Appleton and AIG began preparing for trial in the second half of 2018. In July 2018, Appleton's claim was transferred internally at AIG from Nicole Washor to Christina MacIsaac. In October and November 2018, defense counsel deposed Appleton and retained additional medical experts, including an orthopedic surgeon, gynecologist, neurologist, and urologist, to evaluate her damages claims.

At AIG's urging, Appleton and AIG participated in a third mediation on December 17 and 18, 2018. Appleton's counsel requested that AIG make a $6 million offer in advance of this mediation to ensure that it would be productive for her client. Although MacIsaac declined to make such an offer, she assured Appleton's counsel that it would be worthwhile for Appleton to attend the mediation. Nevertheless, at the mediation, AIG increased its previous offer by only $600,000, from $2.65 million to $3.25 million. Appleton rejected that offer and made a counter-offer of $15.5 million.

About two weeks after the third mediation concluded, on the eve of trial, AIG increased its offer again to $5 million. In January 2019, Appleton served AIG with a Chapter 93A demand letter alleging multiple unfair insurance claims settlement practices and seeking $17.5 million. AIG denied the Chapter 93A claims and reiterated its most recent offer of $5 million, adding on $25 for the new unfair settlement practices claims. The day before the state court trial began, MacIsaac began sending Appleton proposals for a high-low agreement based on a potential verdict.[2] Appleton rejected each of the high-low proposals.

## C. State Court Trial

Appleton's state court trial was held from March 11 to 26, 2019. On March 27, the jury awarded Appleton $7.465 million in damages. The jury award consisted of $655,000 in past medical expenses; $3.2 million in future medical expenses; $210,000 in lost earnings; $1.5 million in past pain and suffering; and $1.9 million in future pain and suffering. In issuing the final judgment, the state court deducted $600,000 for prior settlements

---

[2] In a high-low agreement, the parties agree in advance to a minimum and maximum payment based on the ultimate verdict at trial. For example, AIG's last high-low proposal before trial was for $4 million to $12.5 million. Under this proposal, AIG offered to pay Appleton $4 million if the verdict were equal to or less than $4 million (a result that was unlikely based on AIG's own internal estimates), the actual value of the verdict if it fell between $4 million and $12.5 million, and $12.5 million if the verdict were equal to or greater than $12.5 million.

received[3] and added $1.78 million in pre-judgment interest, for a total of $8.65 million.  Shortly afterwards, Appleton sent a supplemental Chapter 93A demand letter to AIG and National Union.

### D. Federal Court Proceedings

In August 2021, Appleton sued AIG and National Union in federal court, alleging only Massachusetts state law claims and invoking diversity jurisdiction under 28 U.S.C. § 1332. Specifically, she contended that AIG and National Union engaged in unfair insurance claims settlement practices in violation of Chapters 93A and 176D of the Massachusetts General Laws by "fail[ing] to investigate Mrs. Appleton's claim" and "fail[ing] to make a reasonable offer of settlement in the underlying case, and . . . in response to Mrs. Appleton's [Chapter] 93A Demand Letter."  See Mass. Gen. Laws ch. 176D, § 3(9)(d), (f) (2012). The defendants moved for summary judgment.

The district court granted summary judgment to the defendants in full.  See Appleton v. Nat'l Union Fire Ins. Co., No. CV 21-40081, 2024 WL 5344449, at *13 (D. Mass. Sep. 30, 2024).

---

[3] Before the state court trial, Appleton had already received $600,000 in settlements, including one from another insurance company providing liability insurance to the pickup truck driver's employer.  Because the state court deducted the amount Appleton received in prior settlements from the jury award, AIG's settlement offers were functionally worth $600,000 more than an "equivalent" jury award.  Thus, AIG's final pretrial $5 million settlement offer was worth $5.6 million in comparison to the $7.5 million jury award.

It held that the undisputed facts demonstrated that AIG began its investigation of Appleton's insurance claim "within weeks of receiving its first notice," "went beyond simply 'reviewing the materials submitted with [the] claim,'" and "continued to investigate . . . throughout the course of the underlying action" Id. at *12 (citation omitted). It then concluded that such an investigation was reasonable as a matter of Massachusetts law and thus granted the defendants summary judgment on Appleton's section 3(9)(d) claim. See id. The court also determined that the defendants were entitled to summary judgment on Appleton's section 3(9)(f) claim. See id. at *13. In its view, the undisputed facts established that liability never became reasonably clear and, as a result, AIG's duty to extend a prompt and fair settlement offer was never triggered. See id.

Appleton timely appealed.

## II. STANDARD OF REVIEW

"We review a district court's grant of summary judgment de novo, taking the record in the light most favorable to the nonmoving party," here Appleton. Sutherland, 126 F.4th at 737. "Summary judgment is appropriate only where 'there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law.'"  Id. (quoting Mancini v. City of Providence, 909 F.3d 32, 38 (1st Cir. 2018)).

### III. DISCUSSION

Appleton challenges the district court's grant of summary judgment to the defendants.  She contends that the record was replete with genuinely disputed material facts and that a jury should have decided both her section 3(9)(d) and section 3(9)(f) claims.  We begin by setting out the legal framework for these claims and then address each in turn.

To evaluate Appleton's state law claims, we apply Massachusetts substantive law under the Erie doctrine.  See Andrew Robinson Int'l, Inc. v. Hartford Fire Ins. Co., 547 F.3d 48, 51 (1st Cir. 2008) (citing Kathios v. Gen. Motors Corp., 862 F.2d 944, 946 (1st Cir. 1988)).  The Massachusetts Supreme Judicial Court (SJC) is the final authority on Massachusetts law, and its decisions bind both lower state courts and federal courts sitting in diversity.  See id.  When the SJC "has not spoken directly to an issue," we also look to lower state court decisions for guidance.  Id.

Under Massachusetts law, Chapter 93A and Chapter 176D "operate in tandem 'to encourage the settlement of insurance claims . . . and discourage insurers from forcing claimants into unnecessary litigation to obtain relief.'"  Terry v. Hosp. Mut. Ins. Co., 195 N.E.3d 441, 449 (Mass. App. Ct.) (alteration in

original) (quoting <u>Caira</u> v. <u>Zurich Am. Ins. Co.</u>, 76 N.E.3d 1002, 1009 (Mass. App. Ct. 2017)), <u>rev. denied</u>, 197 N.E.3d 866 (Mass. 2022). Chapter 93A bars firms from committing "unfair or deceptive acts or practices" and creates a private right of action for consumers injured by those practices. Mass. Gen. Laws ch. 93A, § 2 (1978). And Chapter 176D defines fourteen specific actions as "unfair claim settlement practices" that violate Chapter 93A for firms "in the business of insurance," like the defendants. Mass. Gen. Laws ch. 176D, §§ 2, 3(9)(a)-(n). Thus, when insurers violate any provision of section 3(9) of Chapter 176D, they also, by definition, violate the prohibition in section 2 of Chapter 93A. See <u>Bobick</u> v. <u>U.S. Fidelity & Guar. Co.</u>, 790 N.E.2d 653, 659 (Mass. 2003).

Appleton contends that the defendants engaged in two unfair claims settlement practices identified in Chapter 176D: "[r]efusing to pay claims without conducting a reasonable investigation based upon all available information" and "[f]ailing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear." Mass. Gen. Laws ch. 176D, § 3(9)(d), (f). The district court granted summary judgment to the defendants on both claims.

We disagree with the district court's ruling on Appleton's section 3(9)(f) claim. As we explain, the record contains genuine disputes of material fact as to whether liability

became reasonably clear and whether the defendants extended a prompt and fair settlement offer afterwards. And, viewing the evidence in the light most favorable to Appleton, we find that a reasonable jury could conclude that the defendants did not satisfy their section 3(9)(f) obligations. Thus, we vacate the grant of summary judgment on that claim and remand for trial. We agree with the district court, however, that the defendants are entitled to judgment as a matter of law on Appleton's section 3(9)(d) claim.

## A. Section 3(9)(f) Settlement Claim

Under section 3(9)(f), the defendants had an obligation to "effectuate [a] prompt, fair and equitable settlement[]" once "liability had become reasonably clear." Mass. Gen. Laws ch. 176D, § 3(9)(f). As the SJC has held, this provision requires an insurer "promptly to put a fair and reasonable offer on the table . . . as soon thereafter as liability and damages make themselves apparent." Bobick, 790 N.E.2d at 658 (quoting Hopkins v. Liberty Mut. Ins. Co., 750 N.E.2d 943, 951 (Mass. 2001)).

To evaluate whether a reasonable jury could conclude that the defendants failed to meet this statutory obligation based on the record here, we must engage in a two-step inquiry. Initially, we consider whether a reasonable jury could find that liability, which encompasses both fault and damages, was reasonably clear at any point prior to judgment. See id. If so, we then assess whether a reasonable jury could find that the

defendants failed to extend a prompt, fair, and equitable settlement offer after that point.  See id.

The defendants concede that these assessments involve "determination[s] of reasonableness" that are "normally . . . question[s] of fact."  Nevertheless, they contend that summary judgment was warranted because "undisputed material facts in the record demonstrate that [Appleton had] 'no reasonable expectation of proving an essential element' of [her] case," namely that liability ever became reasonably clear.  Id. (quoting Kourouvacilis v. Gen. Motors Corp., 575 N.E.2d 734, 740 (Mass. 1991)).  The defendants also maintain that, in the alternative, even if liability had become reasonably clear, their settlement offers were prompt and fair, given disputes regarding the amount of damages and Appleton's purportedly excessive demands.

The district court agreed with the defendants' initial argument.  It held that "no reasonable factfinder could conclude that liability was reasonably clear at the time of trial" and, thus, the defendants' obligation to settle under section 3(9)(f) was not triggered.  Appleton, 2024 WL 5344449, at *13.  Appleton responds that a reasonable jury could find that liability became reasonably clear by at least January 2018 and that the defendants failed to extend a prompt and fair settlement offer afterwards.

We agree with Appleton on both points.  Viewing the record in the light most favorable to her, we conclude that a

reasonable jury could find that AIG's failure to increase its settlement offer of $2.65 million for almost a year after it received multiple estimates placing likely damages at about $7.5 million was unreasonable.

### 1. Did liability become reasonably clear?

We begin with step one of the section 3(9)(f) analysis, whether "liability had become reasonably clear." Mass. Gen. Laws ch. 176D, § 3(9)(f). Although the term "liability" as used in Chapter 176D "encompasses both fault and damages," AIG conceded fault during its negotiations with Appleton. River Farm Realty Tr. v. Farm Family Cas. Ins. Co., 943 F.3d 27, 38 (1st Cir. 2019) (quoting Clegg v. Butler, 676 N.E.2d 1134, 1140 (Mass. 1997)). As a result, we consider only whether a reasonable jury could have found that Appleton's damages became reasonably clear before judgment.[4]

To do so, we apply an objective test and look to "whether a reasonable person, with knowledge of the relevant facts and law,

---

[4] In her opposition to the defendants' motion for summary judgment, Appleton contended that section 3(9)(f)'s liability determination only requires showing that it was "reasonably clear" that she had suffered some damages, not that the amount of damages itself was "reasonably clear." But Appleton does not raise this same argument in her briefs to us. For purposes of this appeal, we follow the lead of the parties in analyzing whether the amount of damages Appleton suffered was "reasonably clear." We leave it to the district court on remand to address whether this focus on the amount of damages -- rather than the existence of at least some damages -- is the proper inquiry under Massachusetts law.

would probably have concluded, for good reason" that damages were reasonably clear. Silva v. Norfolk & Dedham Mut. Fire Ins. Co., 75 N.E.3d 1132, 1136 (Mass. App. Ct. 2017) (quoting O'Leary-Alison v. Metro. Prop. & Cas. Ins. Co., 752 N.E.2d 795, 798 (Mass. App. Ct. 2001)). Critically, an insurer does not need to know the exact "dollar amount of damages" to be liable under section 3(9)(f). Clegg, 676 N.E.2d at 421-22.

To determine whether damages are reasonably clear under this objective test, Massachusetts courts have indicated that a factfinder can consider multiple factors. Those factors include: (i) "the defendant's own evaluation of the plaintiff's claim," O'Leary-Alison, 752 N.E.2d at 798 n.3; (ii) "insurance industry practices in similar circumstances," id.; (iii) "expert testimony that the insurer violated sound claims practices," id.; and (iv) whether there was a "legitimate difference of opinion" or "good faith disagreement" as to the scope of damages, Bobick, 790 N.E.2d at 659.

The first factor, "the defendant[s'] own evaluation of [Appleton's] claim," provides strong evidentiary support for a finding that the value of Appleton's damages became reasonably clear by January 2018. O'Leary-Alison, 752 N.E.2d at 798 n.3. The record shows that, between November 2017 and January 2018, AIG solicited and received three independent estimates of a potential damages award as part of its evaluation of Appleton's claim, and

a reasonable jury could find that these estimates converged on an average of $7.5 million. Initially, AIG's own defense counsel estimated a jury verdict between $6.5 million and $8.5 million. Next, a group of senior AIG adjusters reviewed Appleton's claim and estimated an average verdict of $4.9 million, prompting Washor to increase the reserves to pay Appleton's claim from $4 million to $7.5 million. Finally, AIG hired an external jury consulting firm, which conducted mock trials of Appleton's case and simulated results from 500 juries. On January 4, 2018, the consulting firm informed AIG that the average total award from the mock trials was $7.53 million. Thus, this factor points to a genuine dispute of material fact about whether Appleton's damages were reasonably clear by January 2018.

As for the second and third factors, Appleton's expert on insurance practices and standards opined that AIG violated sound industry practices when it "fail[ed] to make a reasonable offer of settlement" after January 4, 2018. According to the expert, damages became reasonably clear by that date, when AIG received its third estimate of the likely jury verdict.

Finally, there were no "legitimate difference[s] of opinion" regarding the scope of damages here that would have precluded Appleton's damages from becoming reasonably clear under Massachusetts law. <u>Bobick</u>, 790 N.E.2d at 659. For example, Massachusetts courts have found "good faith disagreement[s]"

preventing damages from becoming reasonably clear when the insurer had reason to believe that the plaintiff did not suffer any injury at all.  See, e.g., Silva, 75 N.E.3d at 1134, 1136-37 (quoting Bobick, 790 N.E.2d at 659) (affirming, under clear error standard, bench trial finding that damages were not reasonably clear when plaintiff continued working immediately after accident, waited one year to claim disability, and did not give insurer access to his medical records for three years); O'Leary-Alison, 752 N.E.2d at 798 (affirming factual finding that damages were not reasonably clear when independent medical expert found no injuries warranting treatment, plaintiff did not report any injuries at accident scene, and plaintiff continued working for months afterwards).  Courts also have found a "legitimate difference of opinion" on damages when a plaintiff filed claims against multiple tortfeasors and witness reports provided conflicting evidence about whether an insured party was at fault, and if so, its relative culpability. See Bobick, 790 N.E.2d at 659 (affirming lower court's summary judgment grant to insurer after finding, as a matter of law, that damages were not reasonably clear because reports revealed "differing accounts of events" with varying implications for how multiple tortfeasors "shared responsibility for failing to ensure

the plaintiff's safety").  No such concerns are present in this case, and the defendants do not argue otherwise.

Instead, the defendants contend that damages were not reasonably clear by early 2018 because the parties continued to disagree about "the nature of [Appleton's] damages, particularly her noneconomic damages . . . [for] her conscious pain and suffering."  But, as we have explained, disputes regarding the exact dollar amount of damages do not prevent damages from becoming reasonably clear under Massachusetts law.  See Clegg, 676 N.E.2d at 421-22.

Thus, we conclude that there is a triable issue on whether damages became reasonably clear by January 2018, triggering the defendants' obligation to extend a prompt and fair settlement offer under section 3(9)(f).

## 2. Did the defendants extend a prompt and fair settlement offer?

We now turn to the second and final step of the section 3(9)(f) analysis.  Even if damages became reasonably clear in early 2018, a jury could find that the defendants violated section 3(9)(f) only if they "failed to effectuate [a] prompt, fair and equitable settlement[]" afterwards.  Mass. Gen. Laws ch. 176D, § 3(9)(f).  As the SJC put it in Bobick, insurers have a legal duty "promptly to put a fair and reasonable offer on the table . . . as soon thereafter as liability and damages make themselves apparent."  790 N.E.2d at 658 (quoting Hopkins, 750

N.E.2d at 951).  The relevant legal standard for examining the defendants' response "is 'whether, in the circumstances, and in light of the complainant's demands, the offer is reasonable.'" Id. (quoting Clegg, 676 N.E.2d at 1140).  Importantly, the defendants had this legal duty even if Appleton made excessive demands.  See id. at 660-61.  And Appleton had no corresponding duty under section 3(9)(f) or any other statutory provision to make a prompt or fair demand.

The question, then, is whether a reasonable jury could find that the defendants failed to put a prompt, fair, and equitable offer on the table after January 2018.  Massachusetts law provides several guideposts for a jury evaluating the fairness of a settlement offer.  The jury could compare AIG's offer to AIG's "own evaluation of [Appleton's] claim," as well as the eventual state trial jury verdict.  Id. at 660 (affirming lower court's summary judgment grant to insurer after finding, as a matter of law, that insurer's $50,000 settlement offer was reasonable because it was similar to the insurer's "own evaluation of [its share of] the plaintiff's claim" and it was "not substantially less than" the $60,000 jury verdict); see also Terry, 195 N.E.3d at 453-54 (upholding, under clear error review, factfinding that insurer's $25,000 offer was unreasonable in part because it amounted to one-third of insurer's own $75,000 valuation of plaintiff's damages).  It also could take into account the course

of the parties' negotiations, as "[e]xperienced negotiators do not make their final offer first off, and experienced negotiators do not expect it, or take seriously a representation that it is." Bobick, 790 N.E.2d at 660 (quoting Forcucci v. U.S. Fid. & Guar. Co., 11 F.3d 1, 2 (1st Cir. 1993)). Further, the jury could consider Appleton's demands "as part of the over-all circumstances affecting the amount that would qualify as a reasonable offer in response." Id. at 661. And, finally, an insurer "is not held to standards of omniscience or perfection," O'Leary-Alison, 752 N.E.2d at 799 (quoting Peckham v. Cont'l Cas. Ins. Co., 895 F.2d 830, 835 (1st Cir. 1990)), so its "good faith, but mistaken, valuation of damages does not constitute a violation of [Chapter] 176D," id.

The district court did not evaluate if there was a genuine dispute of material fact about whether the defendants' settlement offers in 2018 were prompt and fair. See Appleton, 2024 WL 5344449, at *13. Notably, at any trial, it would be the defendants' burden "to prove that [$2.65 million] was a reasonable offer in the circumstances and in light of [Appleton's] demands." Bobick, 790 N.E.2d at 659. Given the record here, however, we conclude it is appropriate for us to address this issue on appeal rather than remanding for the district court to decide it in the first instance. See Sutherland, 126 F.4th at 741.

Viewing the record in the light most favorable to Appleton, we conclude that there exists a genuine dispute of material fact on this point. Most importantly, the record demonstrates that, for almost a year after receiving the three jury award estimates ranging from $5 million to $8.5 million, AIG did not increase its previous settlement offer of $2.65 million. As we have explained, a reasonable jury could find that these estimates converged on an average award of $7.5 million. Yet when AIG finally did raise its settlement offer during the parties' third mediation in mid-December 2018, it did so by only $600,000, for a total of $3.25 million. This modest increase came fourteen months after receiving the two estimates ranging from $5 million to $8.5 million and almost a year after receiving the jury consulting firm's $7.5 million estimate.

Next, several years had passed since the accident, and thus the $2.65 million offer on the table in early 2018 was not AIG's initial offer or even its second offer during the settlement negotiations. The parties had already attended two previous mediation sessions by that time. A reasonable jury could conclude that AIG's decision to stick with this offer for nearly a year after damages of about $7.5 million became reasonably clear was neither fair nor equitable, even when considering Appleton's $16 million demand "as part of the over-all circumstances." Bobick, 790 N.E.2d at 661.

Finally, in March 2018, a state jury awarded Appleton $7.5 million in damages.  Looking at this factor under <u>Bobick</u>, a jury in this case could conclude that the actual award Appleton received in her state trial supports the conclusion that AIG's settlement posture throughout 2018 was not fair or equitable.

Accordingly, we conclude that a reasonable jury could find that the defendants did not extend a prompt and fair settlement offer after liability became reasonably clear in January 2018.  We thus vacate the district court's grant of summary judgment as to Appleton's section 3(9)(f) claim.

## B. Section 3(9)(d) Reasonable Investigation Claim

We now turn to Appleton's claim that the defendants are liable under section 3(9)(d) for "[r]efusing to pay claims without conducting a reasonable investigation based upon all available information."  Mass. Gen. Laws ch. 176D, § 3(9)(d).  An insurer has an obligation under section 3(9)(d) to "investigate claims thoroughly to determine [its] liability" because "an [insurer's] duty to settle [under section 3(9)(f)] does not arise until 'liability has become reasonably clear.'"  <u>Clegg</u>, 676 N.E.2d at 1140 (quoting Mass. Gen. Laws ch. 176D, § 3(9)(f)).

To conduct a reasonable investigation under section 3(9)(d), insurers must take "basic steps toward obtaining an independent or neutral assessment" of liability.  <u>Terry</u>, 195 N.E.3d at 450 (quoting <u>McLaughlin</u> v. <u>Am. States Ins. Co.</u>, 55 N.E.3d

1007, 1016 (Mass. App. Ct. 2016)). Accordingly, courts have determined that insurers did not conduct a reasonable investigation under Massachusetts law in two situations: when those investigations were clearly biased or when the insurers failed to investigate at all. For example, courts have found section 3(9)(d) violations when the insurer "engaged in a results-oriented treatment of the evidence" by "cherry-pick[ing]" favorable facts and "disregard[ing] unfavorable evidence." Id. (citations omitted). And we have held that an insurer violated section 3(9)(d) when, "other than reviewing the materials submitted with [the plaintiff's] claim, it appear[ed] that [the insurer] did no investigation of the available facts before denying coverage." Fed. Ins. Co. v. HPSC, Inc., 480 F.3d 26, 36 (1st Cir. 2007) (finding no clear error in district court's conclusion).[5]

---

[5] Although section 3(9)(d) bars insurers from "[r]efusing to pay claims without conducting a reasonable investigation based upon all available information," courts have interpreted this provision to apply even when an insurer does not deny the plaintiff's claim altogether. Mass. Gen. Laws ch. 176D, § 3(9)(d) (2012) (emphasis added). Instead, Massachusetts courts have focused on the latter half of the provision, characterizing the requirement as one "to investigate insurance claims promptly and reasonably." Terry, 195 N.E.3d at 449. Thus, courts have found violations of section 3(9)(d) in situations where an insurer has agreed to pay the plaintiff's claim and extended a settlement offer, but the plaintiff rejected the offer as too low (as Appleton did here). See, e.g., id. at 449-51 (affirming trial court's finding that insurer violated section 3(9)(d) despite extending a pretrial settlement offer); see also Urban v. Zurich Am. Ins. Co., 752 F. Supp. 3d 310, 317, 337-39 (D. Mass. 2024) (after bench trial, finding section 3(9)(d) violation even though insurer made

Appleton, however, does not argue that the defendants conducted a biased investigation or failed to conduct any investigation of their own. Instead, she claims that four specific acts by AIG violated section 3(9)(d): (i) Washor's failure to investigate Appleton's claim for the first nine months after she was assigned to it in December 2015; (ii) Washor's attempts to pursue a liability defense even after defense counsel advised no such defense was available; (iii) AIG's failure to document reviewing, evaluating, or otherwise investigating Appleton's medical records after receiving them in March 2016; and (iv) AIG's failure to obtain objective expert reports about Appleton's damages for the two years after the initial mediation session in March 2017.

None of Appleton's arguments support sending her section 3(9)(d) claim to a jury. We begin with Appleton's argument that AIG waited too long to start investigating her claim. The record does indicate that Washor was assigned to Appleton's claim in December 2015 but did not begin investigating it until hiring defense counsel in September 2016. But, after Appleton shared her medical records and bills with AIG in March 2016, Washor informed Appleton's attorney that AIG needed "a complete demand package," including her medical records, lien information, liability

---

"three offers in the course of negotiation in the underlying matter and one offer following a verdict").

arguments, and settlement demand, "in order to proceed with a resolution of this case." And it is undisputed that Appleton did not share that demand package with AIG until August 2016, at which point AIG began hiring defense counsel. Appleton has not cited any case law to indicate that insurance companies must, in all circumstances, start an investigation even before receiving a demand package in order to satisfy section 3(9)(d). Nor has Appleton identified any specific investigative steps that AIG allegedly should have taken before receiving her demand package. In this damages-only case, the most important evidence focused on Appleton's injuries and their impact on her life -- information in Appleton's control. On this specific record, we see no basis for a jury to conclude that AIG acted unreasonably in waiting to receive Appleton's demand package before it began its own investigation.

Next, Appleton claims that Washor continued to pursue a liability defense even after defense counsel advised AIG in December 2016 that this was a damages-only case. But Appleton has failed to point to any record evidence suggesting that Washor did, in fact, pursue a liability defense despite counsel's advice. Thus, we see no genuine factual dispute for a jury to resolve on this point either.

Appleton's third argument, about AIG's alleged failure to document reviewing, evaluating, or otherwise investigating her

medical records, is also unpersuasive. Appleton concedes that AIG's defense counsel did, in fact, review Appleton's medical records in October 2016, about one month after AIG received her full demand package. She cites no case law that a one-month delay in reviewing documents can be enough to violate section 3(9)(d). Thus, we reject this argument as well.

Finally, Appleton mischaracterizes the record in claiming that AIG failed to obtain objective expert reports. Although Appleton acknowledges that AIG hired two experts before the March 2017 mediation, she simultaneously contends that AIG's failure to "obtain[] any other expert opinions relating to Plaintiff's damages for [the] two years [afterwards]" violated section 3(9)(d). It is undisputed, however, that Appleton asked AIG to suspend the March 2017 mediation so she could provide additional evidence about her bladder injury and that internal communications indicate that AIG decided to wait for that evidence before retaining additional experts of its own. It is also undisputed that AIG retained four additional medical experts between October and November 2018 to evaluate Appleton's case, including an orthopedic surgeon, gynecologist, neurologist, and urologist, two of whom wrote reports that were disclosed for trial. Thus, the summary judgment record demonstrates that AIG did retain medical experts who wrote expert reports about Appleton's damages in the two years after the March 2017 mediation.

To the extent that Appleton is arguing that experts hired by defense counsel cannot provide objective opinions that satisfy AIG's own section 3(9)(d) obligation, she does not cite any case law to support that argument.  Nor does she identify any specific facts from the record to indicate that the experts AIG retained in 2018 were incapable of providing a reliable medical opinion.  This aspect of Appleton's section 3(9)(d) argument is therefore waived for lack of development.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").  As a result, we affirm the district court's grant of summary judgment to the defendants as to Appleton's section 3(9)(d) claim.[6]

### IV. CONCLUSION

For all these reasons, we **vacate** the district court's grant of summary judgment on Appleton's section 3(9)(f) claim, **affirm** its grant of summary judgment on her section 3(9)(d) claim,

---

[6] During oral argument, Appleton conceded that the only time period during which AIG's actions could have given rise to a section 3(9)(d) claim was the three-month period between October 2017 and January 2018 because, if AIG had conducted a reasonable investigation, damages would have become reasonably clear in October 2017 rather than in January 2018.  We do not rely on this concession in rejecting the four arguments Appleton raises on appeal and do not otherwise address it, as neither party briefed its implications.

and **remand** for further proceedings consistent with this opinion. The parties shall bear their own costs.